UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DEEKSHA K. SINGH,

               Plaintiff,

         -v-                                    06-CV-0299-JTC-LGF

NEW YORK STATE DEPARTMENT OF
TAXATION AND FINANCE,
INTERNAL REVENUE SERVICE,
ERIE COMMUNITY COLLEGE,
MR. LOUIS J. CERCONE, JR.,
BRISBANE CONSULTING GROUP, LLC,
MS. EVELYNE O'SULLIVAN,
MR. AJIT SINGH,
COUNTY OF ERIE,
MR. WILLIAM D. REUTER,
MS. CONSTANCE MARCUS,
MS. JACQUELINE BOGDAN, and
LARRY S. STOLZENBURG,

               Defendants.

_____

      Plaintiff Deeksha K. Singh commenced this lawsuit on May 9, 2006, as a putative

class action against her former employer, the New York State Department of Taxation &

Finance ("NYSDOTF"), alleging discrimination based on her sex (female) and national

origin (India) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§§ 2000e *et seq*.  Item 1.  Plaintiff was subsequently granted leave to amend the complaint

by adding several new claims and defendants, including claims under the Americans with

Disabilities Act ("ADA"), 42  U.S.C. § 12101 *et seq*., and the Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 *et seq*., against plaintiff's current employer, Erie Community

College ("ECC") and its Financial Officer William D. Reuter (referred to collectively as the "ECC Defendants"), and the County of Erie. *See* Item 40.

By order entered October 25, 2011 (Item 107), this court adopted the "Decision and Order/Report and Recommendation" of Hon. Leslie G. Foschio, United States Magistrate Judge, entered on July 28, 2011 (Item 96), resulting in dismissal with prejudice of most of the plaintiff's claims. *Singh v. N. Y. Dept. of Taxation and Fin.*, 2011 WL 3273465 (W.D.N.Y. Jul. 28, 2011), *report and recommendation adopted by* ___F. Supp. 2d___, 2011 WL 5069393 (W.D.N.Y. Oct. 25 , 2011). This left for further litigation only plaintiff's Title VII claim asserted in the original complaint against NYSDOTF, and the FMLA and ADA claims asserted in the amended complaint (as supplemented by additional facts alleged in plaintiff's proposed second amended complaint) against the ECC Defendants and Erie County. Following further discovery, these defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the claims remaining in this action.[1]

For the reasons that follow, the motions for summary judgment are granted, and the case is dismissed.

## BACKGROUND

The following facts are derived from the moving defendants' statements of fact on summary judgment (Items 150-2, 151-4 and 152-2) and supporting affidavits and exhibits,

---

[1] In support of its summary judgment motion, the County of Erie (which was not plaintiff's employer at any time relevant to the matters at suit) "fully adopts and incorporates by reference" the matters set forth in the summary judgment submissions of the ECC Defendants. Item 152-1, ¶ 4.

submitted in accordance with Rule 56 of the Local Rules of Civil Procedure for the Western District of New York.[2]

## 1. Plaintiff's Employment With NYSDOTF

Plaintiff began working as a Tax Auditor for the New York State Department of Tax and Finance in December 2001, assigned to the Income Tax Division in the Buffalo Division Office. Her initial appointment was to the position of Tax Auditor Trainee II, Grade 14, with a one-year probation period. Her work duties included use of the computer system and the software; determining appropriate candidates for audits; performing audits and preparing the accompanying paperwork; and attending training sessions. Her immediate supervisor was Michael Van Wagnen, who was responsible for supervision, training and evaluation of probationary auditors. *See* Item 150-2, ¶¶ 1, 28, 32-33.

In April 2002, plaintiff was promoted to the position of Tax Auditor I, Grade 18, based on her education (Bachelor of Science/Accounting) and prior work experience. This extended her probation period until April 2003. Item 150-4 (Van Wagnen Decl.), ¶¶ 15-16.

---

[2]Under Local Rule 56, a party moving for summary judgment is required to include with its motion a "separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried …," Local Rule 56(a)(1), and the party opposing the motion is required to submit a written response. Local Rule 56(a)(2). Further, "[e]ach numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." *Id.*

Each moving defendant has filed a Local Rule 56(a)(1) statement, and each notice of motion contains a "Notice To Pro Se Litigant," as required by Local Rule 56(b), notifying plaintiff that in the absence of Rule 56(a)(2) response, "all material facts set forth in defendant's statement of material facts not in dispute will be deemed admitted." Items 150, 151, 152. Plaintiff has not submitted the responding statement required by Local Rule 56(a)(2). Accordingly, the facts set forth in defendants' Local Rule 56(a)(1) statements are deemed admitted to the extent they are supported by the record evidence. *See Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir.1992) ("When a party has moved for summary judgment ... and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."); *Bonilla v. BOCES*, 2010 WL 3488712, at *1 (W.D.N.Y. Sept. 2, 2010).

On her first two Probationary Period Evaluation Reports, prepared and signed by Mr. Van Wagnen on July 26, 2002, and November 6, 2002 respectively, plaintiff received a summary rating of "Meets Expectations." *See* Item 57, pp. 68, 70; Item 150-2, ¶¶ 43-44. Plaintiff then took FMLA-approved maternity leave from approximately November 22, 2002, until June 19, 2003, which resulted in the further extension of her probationary period until December 2003. *See* Item 150-4, ¶¶ 21-22.

On her third Probationary Period Evaluation Report, prepared by Mr. Van Wagnen and signed on September 19, 2003, plaintiff received a summary rating of "Needs Improvement." Item 57, pp. 72; Item 150-2, ¶ 46. Mr. Van Wagnen noted deficiencies with respect to several specific performance factors, including quality of work (lack of attention to clarity in written materials); productivity (low number of case closures); personal work characteristics (reluctance to travel due to personal matters); problem solving/decision making (unfamiliarity with tax law); and distraction due to difficulties in her personal life. *Id.*

In a letter dated September 24, 2003, District Audit Manager Arthur J. Maloney informed plaintiff that the deficiencies outlined in her third Probationary Evaluation needed to be addressed immediately, and that she would be reevaluated on a regular basis to give her "every opportunity to improve her job performance." Item 57, p. 80. The letter continued:

> I cannot over emphasize the need for immediate and substantial improvement in the deficient areas. I plan to meet with you, Mr. Van Wagnen and Mr. [Jorge] Reyes [Van Wagnen's supervisor] in 4-5 weeks to evaluate your progress. Without immediate improvement we will be left with no choice but to recommend termination of your probation.

*Id.*

On her fourth Probationary Period Evaluation Report, signed by Mr. Van Wagnen on November 11, 2003, plaintiff received a summary rating of "Unsatisfactory," with particular performance deficiencies noted in the areas of Personal Work Characteristics and Problem Solving/Decision Making. Item 57, pp. 74-77. Mr. Van Wagnen provided the following "Additional Comments:"

> [Plaintiff] has not demonstrated sufficient progress in any of the deficient areas that were cited in the previous report. Actually in areas of Personal Work Characteristics and Problem Solving/Decision Making, [plaintiff]'s performance has slipped. Also, [plaintiff] has not demonstrated the independence and technical expertise that is required of a Tax Auditor I. Therefore, we are recommending that a second probationary period be served. This will provide sufficient time to evaluate [plaintiff]'s ability to perform the full duties of a Tax Auditor I.

*Id.* at 77.

On December 10, 2003, NYSDOTF's Director of Human Resources Management Deborah Dammer sent plaintiff a letter notifying her that:

> Your supervisor has recommended, and I have approved, a second probationary period for you beginning December 12, 2003. In accordance with Civil Service Rules, you are being given a new assignment under a different supervisor. Your probation will last from 12 to 26 weeks. If warranted, however, your new supervisor can recommend termination of your appointment after 8 weeks. You will receive Probationary Period Evaluation Reports at 8, 16, and 23 weeks of the new probationary period.

Item 28, p. 175.

As memorialized in a series of emails, plaintiff met with Mr. Maloney on December 17, 2003, to discuss the arrangement for plaintiff's new probationary period. Mr. Maloney advised plaintiff that Jorge Reyes was designated to be her new supervisor with responsibility for the overall evaluation of her work performance, and that when Mr. Reyes was unavailable she should seek guidance from her previous supervisor, Mr. Van Wagnen.

*See* Item 28, pp. 28-29. Plaintiff expressed her concerns about Van Wagnen's "unfair[ ]" treatment of her, and requested "another supervisor … who will actually be interested in training me." *Id.* at 29. Mr. Maloney responded that, despite plaintiff's concerns, Van Wagnen was the appropriate choice to provide backup supervision given his qualifications, experience as a team leader, and familiarity with the case assignments. *Id.* at 28.

On December 22, 2003, plaintiff tendered her written resignation to Mr. Maloney, stating as follows:

> I hereby resign from the position of Tax Auditor I …. This resignation is due to your decision to not change my supervisor during my "second probationary period." Please accept my two-week notice. I will be ending my employment with [NYSDOTF] on January 2, 2004.

Item 57, p. 79. As documented in a letter to plaintiff from Associate Personnel Administrator James Bishop, plaintiff and Mr. Bishop had a telephone conversation the next day to discuss her resignation. Item 28, pp. 95-96. Mr. Bishop indicated in the letter that he told plaintiff he had discussed the matter with Mr. Maloney and they agreed that Mr. Reyes would be plaintiff's new supervisor, and that Mr. Van Wagnen would provide guidance "only in those situations where another team leader was not available …." Item 28, p. 95. Mr Bishop offered plaintiff the opportunity to rescind her resignation, but plaintiff informed him "that [she] had been offered a new position which [she] had already accepted, and that [she] felt that it was best that [she] not rescind the resignation and serve a second probationary period with a new supervisor." *Id.* at 95-96.

Plaintiff's last date of employment with NYSDOTF was January 2, 2004. She began working at ECC on January 5, 2004. Item 150-2, ¶ 53.

On September 17, 2004, plaintiff filed a verified complaint with the New York State Division of Human Rights ("NYSDHR") and the United States Equal Employment Opportunity Commission ("EEOC") charging NYSDOTF with unlawful discrimination relating to employment, in violation of Article 15 of New York State Executive Law and Title VII of the Civil Rights Act of 1964. Item 28, pp. 78-80. She alleged that Mr. Van Wagnen and other co-workers made discriminatory comments about her race, national origin, gender, and marital status, forcing her to resign on December 23, 2003. *See id.*

On November 8, 2005, the NYSDHR issued a "Determination and Order After Investigation" finding no probable cause to believe that NYSDOTF engaged in the unlawful discriminatory practice complained of. Item 28, p. 72. Specifically, NYSDHR found that, upon investigation and review of related information and evidence presented by the parties, there was no support for plaintiff's allegations that she was discriminated against because of her sex, marital status or national origin. Rather, "[t]he evidence indicates [plaintiff] resigned voluntarily to accept a position with Erie Community College." *Id.* The EEOC adopted these findings by "Dismissal and Notice of Rights" issued February 9, 2006, advising plaintiff that any lawsuit based on the administrative charge challenging the employment action under Title VII must be filed within 90 days of receipt of the Notice. *Id.* at 76.

**2.      Plaintiff's Employment With ECC**

As of this writing, plaintiff remains employed by ECC as a College Accountant/Auditor assigned as the Internal Auditor.  Her direct supervisor is Richard G. Schott, ECC's Associate Vice President for Finance. Plaintiff's work duties involve internal

auditing of weekly payroll and purchasing, and assisting with preparation of accounting record and reports. Her job functions involve regular interaction with other members of the Finance Department, as well as members of other ECC departments during periodic audits. *See* Item 151-4, ¶¶ 8-10.

On July 15, 2008, without approval from the Human Resources department, plaintiff began an extended leave of absence due to unspecified illness. Upon submission of the appropriate paperwork, she was approved for 12 weeks of FMLA leave, from July 15 through October 6, 2008. Plaintiff then took administrative leave until July 2009, and she was reinstated to her previous position upon her return. She was also granted a step increase in salary at the interval determined by her employment contract. She has made no further requests for FMLA leave during her employment at ECC. *Id.* at ¶¶ 11-13; *see also* Item 151-2 (Flaherty Decl.), ¶¶ 4-7.

William D. Reuter was the Interim President of ECC from December 2006 until April 2008, when he assumed his current position as ECC's Chief Administration and Financial Officer. He was at no time involved with day-to-day personnel decisions related to FMLA or ADA compliance, and did not participate in any decisions relating to any requests made by plaintiff for reasonable accommodations or for FMLA leave. Item 151-2, ¶¶ 9-10; Item 151-4, ¶ 14.

## DISCUSSION

### A.    Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Although the language of this Rule has been amended in recent years, the well-settled

standards for considering a motion for summary judgment remain unchanged. *See, e.g.,*

*Faulkner v. Arista Records LLC*, 797 F. Supp. 2d 299, 311 n. 7 (S.D.N.Y. 2011); Fed. R.

Civ. P. 56, Committee's notes to 2010 amendments. Under those standards, the moving

party bears the initial burden of establishing that no genuine issue of material fact exists.

*Rockland Exposition, Inc. v. Great American Assur. Co.*, 746 F. Supp. 2d 528, 532

(S.D.N.Y. 2010), *aff'd*, 445 F. App'x 387 (2d Cir. 2011). A "genuine issue" exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might

affect the outcome of the suit under the governing law …." *Id.*

Once the court determines that the moving party has met its burden, the burden

shifts to the opposing party to "come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986) (internal quotation marks and citation omitted). The nonmoving party may not

rest upon mere conclusory allegations or denials, but must set forth "concrete particulars

showing that a trial is needed …." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69,

77 (2d Cir. 1984) (internal quotation marks and citation omitted), *quoted in Kaminski v.*

*Anderson*, 792 F. Supp. 2d 657, 662 (W.D.N.Y. 2011). "An opposing party's facts must be

material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant,

gossamer inferences, conjectural, speculative, nor merely suspicions." *Contemporary*

*Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n.14 (2d Cir. 1981). In considering

whether the parties' respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks and citation omitted).

The Second Circuit has also held that, when deciding whether summary judgment should be granted in an employment discrimination case, the court "must take additional considerations into account." *Desir v. City of New York*, 2011 WL 5176178, at *1 (2d Cir. Nov. 2, 2011) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). As stated in *Gallo*:

> A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue. Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.

*Gallo*, 22 F.3d at 1224. Nonetheless, summary judgment remains appropriate in discrimination cases, as "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to … other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), *cert. denied*, 534 U.S. 993 (2001); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (affirming grant of summary judgment in favor of employer

based on plaintiff's failure to produce evidence of pretext), *cert. denied*, 540 U.S. 811 (2003).

The court is also cognizant of its duty not only to liberally interpret *pro se* submissions, *see Burgos*, 14 F.3d at 790, but also to give *pro se* plaintiffs "extra consideration" and "special latitude on summary judgment motions." *Bennett v. Goord*, 2006 WL 2794421, at *3 (W.D.N.Y. Aug. 1, 2006) (quoting *Salahuddin v. Coughlin*, 999 F. Supp. 526, 535 (S.D.N.Y. 1998)), *aff'd*, 2008 WL 5083122 (2d Cir. 2008). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases), *quoted in Bennett*, 2006 WL 2794421, at *3.

## B.     NYSDOTF's Motion

NYSDOTF moves for summary judgment dismissing the complaint against it, on the ground that plaintiff cannot establish a viable claim of discrimination under Title VII.

Title VII makes it unlawful "for an employer ... to fail to hire or to discharge any individual, or otherwise to discriminate against any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[3]  In cases such as this one, where there is no direct or overt evidence of discriminatory conduct, courts apply the three-part burden-shifting analysis articulated by the Supreme

---

[3]Plaintiff cannot maintain an action under Title VII relating to her allegations of discrimination based on divorce or marital status, as these are not protected classes under Title VII.

Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See, e.g., Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); *Phillips v. Marriott Int'l, Inc.*, 2010 WL 1269772, at *4 (E.D.N.Y. Mar. 30, 2010). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) she was in a protected group; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003); *Collins v. N.Y. City Trans. Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).

Once the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks omitted).

Upon the defendant's proffer of a legitimate non-discriminatory reason for its employment action, "the presumption of discrimination arising with the *prima facie* case drops from the picture … [and] the plaintiff must then establish that the defendant's proffered reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 510–11); *see also Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997), *cert. denied*, 522 U.S. 1075 (1998). To demonstrate pretext:

> The plaintiff must produce not simply some evidence, but sufficient evidence
> to support a rational finding that the legitimate, non-discriminatory reasons

proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.

*Weinstock*, 224 F.3d at 42 (internal quotation marks, citations, and alterations omitted).

Plaintiff's Title VII claim in this action fails at the third and fourth steps of the *prima facie* inquiry, because she cannot show that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination. It is undisputed that plaintiff voluntarily resigned her position with NYSDOTF, after she had already accepted a position with ECC. Indeed, this was the reason given by NYSDHR for dismissal of her administrative charge.

Courts have recognized that, if the employment action at issue is the result of the plaintiff's voluntary resignation or transfer unaccompanied by significant loss of salary or diminished job responsibilities, then the requirement of an adverse employment action is not satisfied. *See, e.g., Miller v. Praxair, Inc.*, 408 F. App'x 408, 410-11 (2d Cir. 2010) (voluntary resignation under circumstances not amounting to constructive discharge or hostile work environment did not constitute adverse employment action), *cert. denied*, ___ U.S. ___, 131 S.Ct. 3067 (2011); *Adams v. Yale-New Haven Hosp.*, 2012 WL 4443992, at *7 (D. Conn. Sept. 25, 2012) (voluntary lateral transfer with no significant change in conditions of employment not an adverse employment action). Similarly, negative job evaluations may constitute adverse employment actions where they "affect ultimate employment decisions such as promotions, wages or termination." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010); *see also Sotomayor v. City of New York*, 2012 WL 1889780,

at *21 (E.D.N.Y. May 24, 2012) (Criticism of an employee in the course of evaluating and correcting her work is not an adverse employment action unless it triggers other negative consequences to the terms and conditions of the plaintiff's employment; citing cases).

Here, plaintiff claims that she was forced to resign because she "was working under hostile work conditions and that the 'Second Probationary Period' was simply to build a case against [her] and to push [her] out the door." Item 1, p. 10. As recognized by the Second Circuit, in determining whether an employee's resignation was voluntary or was the result of workplace discrimination so as to constitute an adverse employment action for the purpose of establishing a *prima facie* Title VII claim, courts will look to whether the circumstances amounted to "constructive discharge" or "hostile work environment." *See Miller v. Praxair*, 408 F. App'x at 410-11; *see also Morris v. Schroder Capital Management Intern.* 481 F.3d 86, 88 (2d Cir. 2007); *Terry*, 336 F.3d at 151-52; *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72-74 (2d Cir. 2000).

### 1. *Constructive Discharge*

Constructive discharge occurs "when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (internal quotation marks and citation omitted). A constructive discharge requires working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* To establish a triable issue of fact in this regard, the courts have required the plaintiff to come forward with evidence from which a reasonable inference might be drawn (1) that the employer's actions were

"deliberate and not merely negligent or ineffective," *Petrosino v. Bell Atlantic*, 385 F.3d 210, 230 (2d Cir. 2004), and (2) that a reasonable person in the employee's position would find the working conditions objectively intolerable. *Id.*; *see also Terry*, 336 F.3d at 152.

Viewing the evidence presented on the summary judgment record in this case in the light most favorable to plaintiff, no rational juror could find that Mr. Van Wagnen, or anyone at NYSDOTF, deliberately made things so unpleasant for plaintiff that a reasonable person in her position would have felt compelled to resign. To the contrary, the undisputed evidence shows that NYSDOTF management gave plaintiff ample opportunity to address documented deficiencies in her work product, including extending her probationary period and assigning a new supervisor to evaluate her performance. Instead of continuing her employment under these circumstances, she chose to tender her resignation and accept an offer to work at ECC. There is no evidence upon which a jury could infer that this choice was made involuntarily as the result of working conditions which NYSDOTF deliberately caused to be so objectively intolerable that a reasonable person in her position would have been compelled to resign.

## 2. *Hostile Work Environment*

Plaintiff also claims that she was forced to resign because she was subjected to a hostile work environment. To succeed on this claim, plaintiff must show (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer. *Gorzynski v. Jet Blue Airways*, 596 F.3d 93, 102, 103 (2d Cir. 2010). Courts will examine

the totality of the circumstances comprising the hostile environment claim, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere occasional utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. The incidents must be "sufficiently continuous and concerted in order to be deemed pervasive." *Gorzynski*, 596 F.3d at 102.

In this case, taking plaintiff's allegations as true and drawing all reasonable inferences in her favor, no rational juror could find that the NYSDOTF workplace was permeated with discriminatory intimidation of such a severe or pervasive nature that a reasonable employee in plaintiff's position would have felt compelled to resign. To support her hostile work environment claim, plaintiff relies on allegations of intermittent comments made by Mr. Van Wagen and other NYSDOTF employees over the course of plaintiff's two-year period of employment. For example, plaintiff claims that soon after she began working at NYSDOTF, Van Wagen commented that he wished they would have hired a man; asked her about her citizenship; told her that she was not a "real American;" and asked if she came over on a "boat." Item 49, p. 5; *see also* Item 150-3, pp. 51-53. She alleges that Van Wagen was never friendly toward her, commented about her English, and occasionally mentioned his distaste for "anything foreign … from food to people." Item 49, p. 5. She also alleges that her union representative, Steve Nawrocki, repeatedly asked her if she planned to name her son "Udai" (the name of one of Saddam Hussein's sons), and that a co-worker at NYSDOTF, Laura Lonie, occasionally made derogatory remarks about Middle Eastern and Muslim culture. *Id.* at 5, 8.

While plaintiff may have found these comments to be offensive, "[i]solated incidents of offensive conduct are generally inadequate to establish a hostile work environment

claim." *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 262 (E.D.N.Y. 2009), *aff'd*, 371 F. App'x 115 (2d Cir. 2010). On their face, the comments were not physically threatening, and there is nothing in the record to suggest that the comments somehow unreasonably interfered with plaintiff's work performance. "Certainly even sporadic racially offensive or insensitive utterances can be hurtful, but the issue here is whether they rise to the level of being actionable." *Hannah v. One Communications*, 2011 WL 5282633, at *7 (W.D.N.Y. Sept. 28, 2011), *report and recommendation adopted by* 2011 WL 5289778 (W.D.N.Y. Nov. 2, 2011). As stated by the Second Circuit in the *Petrosino* case, the court must remain "mindful that Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious)" will not support a hostile work environment claim. *Petrosino*, 385 F.3d at 223 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("simple teasing" or "offhand comments, and isolated incidents [unless extremely serious] will not amount to discriminatory changes in the 'terms and conditions of employment' ").

Even if the conduct alleged could be found to sufficiently severe or pervasive enough to create a hostile work environment that would have compelled a reasonable person in plaintiff's position to resign, plaintiff has failed to demonstrate or articulate a specific basis for imputing any such conduct to the employer. To the contrary, the undisputed facts establish that NYSDOTF management provided plaintiff a reasonable opportunity to improve upon the work performance deficiencies documented in her third and fourth evaluation reports by authorizing a new probation period in a new assignment

under a different supervisor. When she continued to voice her concerns about Mr. Van Wagnen's new role as her alternate source of guidance in the new supervisor's absence, she was given the opportunity to discuss the matter at further length with the Human Resources Department and the District Audit Manager, and obtained clarification of the new arrangement by which she would only have to seek guidance from Van Wagnen if there were no other team members to assist her. She voluntarily chose not to participate in the arrangement, and resigned. Presented with these undisputed facts, no jury could find that the sporadic incidents of offensive conduct on the part of plaintiff's supervisor and co-workers alleged by plaintiff, taken as true and considered as a whole, could be found serious enough to have altered her conditions of employment, or that a specific basis exists for imputing that conduct to NYSDOTF.

### 3. *Retaliation*

To the extent plaintiff's allegations can be construed to assert a claim that NYSDOTF retaliated against her after she complained about discriminatory treatment, that claim would also fail on *prima facie* inquiry. To establish a *prima facie* case of retaliation under Title VII, plaintiff must prove (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII, (2) that the employer was aware of that activity, (3) that the employer took an adverse employment action against the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse action. *See Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 205-206 (2d Cir. 2006); *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001). As discussed above, the undisputed facts reveal that plaintiff voluntarily resigned from

NYSDOTF after accepting a position at ECC, and she has failed to establish that her resignation occurred under circumstances amounting to constructive discharge or hostile work environment.

In addition, the facts in the record on summary judgment establish that plaintiff suffered no loss of salary, diminished job responsibilities, or other significant changes in the terms or conditions of her employment as a result of the performance evaluations she received during her first probationary period. Rather, she received a promotion approximately three months after she began her employment at NYSDOTF based on her education and experience. When her evaluator noted performance problems, plaintiff was allowed a new probationary period to address the deficiencies, her request to be assigned a new supervisor was granted, and she remained assigned to the same division and carried the same title and case load. Indeed, even after she tendered her resignation, she was given the opportunity to reconsider upon receiving clarification from management regarding the revised supervisory hierarchy for her second probationary period. She declined, having by that time accepted the position at ECC.

Considering these undisputed facts, no reasonable jury could find that plaintiff's resignation from NYSDOTF occurred under circumstances giving rise to an inference of discrimination. Accordingly, the court finds that, after ample opportunity for discovery, plaintiff has failed to establish a *prima facie* case of discrimination in employment against NYSDOTF actionable under Title VII, and NYSDOTF is entitled to judgment in its favor as a matter of law, pursuant to Fed. R. Civ. P. 56(a).

**C.     ECC's Motion**

As the result of the prior orders entered in this case, the court has broadly construed plaintiff's pleadings to assert ADA and FMLA claims against her current employer, ECC, and individually against ECC's interim president during the relevant time period, William D. Reuter.  To the extent the claims can be more specifically construed, plaintiff claims that ECC and Mr. Reuter denied her requests for leave, flex time, and other reasonable accommodations for her deteriorating medical condition, and retaliated against her for making these requests, in violation of both the ADA and the FMLA.  ECC and Reuter seek summary dismissal of these claims on the following grounds:

1.     Plaintiff's ADA claim against ECC must be dismissed for failure to exhaust administrative remedies.

2.      Plaintiff cannot maintain an FMLA claim against ECC.

3.     Plaintiff cannot maintain a claim against Mr. Reuter individually under either the ADA or the FMLA.

Each of these grounds is addressed in turn.

**1.     *Failure to Exhaust ADA Claim Against ECC***

It is well-settled that exhaustion of administrative remedies is a prerequisite to a federal court civil action seeking redress under the ADA for discrimination in employment due to disability. *McInerney v. Rensselaer Polytechnic Institute*, 505 F.3d 135, 138 (2d Cir. 2007) (Title I of ADA, prohibiting employers from discriminating against disabled employees, incorporates administrative exhaustion provisions of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5(e)(1), requiring employee to file a charge of employment

discrimination with EEOC within 180 days after discriminatory act); *see also Paluh v. HSBC Bank USA*, 409 F. Supp. 2d 178, 196 (W.D.N.Y. 2006) (citing *Curto v. Edmundson*, 392 F.3d 502, 503 (2d Cir. 2004)). Thus, where the employee did not seek administrative review of her discrimination claim, the federal court must dismiss the ADA claim with prejudice. *Curto*, 392 F.3d at 503 (affirming dismissal of ADA claims in the absence of evidence showing that plaintiff exhausted her administrative remedies prior to filing her ADA claim in federal court).

In this case, the record is clear and undisputed that plaintiff at no time sought administrative review of her claim that she was discriminated against because of her disability during her employment at ECC. The only administrative complaint brought by plaintiff with respect to the matters alleged in her federal court pleadings was the NYSDHR/EEOC charge against her previous employer, NYSDOTF, filed in September 2004. As discussed above, that charge involved allegations of discriminatory treatment in the workplace at NYSDOTF between December 2001 and December 2003, and the charge was dismissed by NYSDHR in November 2005 following full administrative investigation and review. Even broadly construed under the standards for considering *pro se* submissions, there is nothing contained in the factual allegations related to that charge to suggest that the conduct alleged to have occurred during plaintiff's employment at ECC in 2008-09 could somehow have fallen within the scope of the NYSDHR investigation which might reasonably be expected to grow out of the charge of discrimination in the workplace at NYSDOTF in 2001-03. *See Williams v. New York City Housing Authority*, 458 F.3d 67, 70 (2d Cir. 2006) (claims not raised in administrative charge may be brought in federal court if they are "reasonably related" to the claim that was filed with the agency).

Accordingly, the court finds that plaintiff has not exhausted her administrative remedies with respect to her allegations that she was discriminated against during her employment at ECC because of her disability, and she is therefore precluded from bringing an ADA claim against ECC in federal court. ECC is entitled to summary judgment dismissing that claim with prejudice.

### 2. *Plaintiff Cannot Maintain a Claim Under the FMLA*

The FMLA was enacted by Congress in 1993 to address "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods …." 29 U.S.C. § 2601(a)(4).[4] The FMLA provides eligible employees with certain substantive rights with which employers cannot interfere, including the right to take unpaid leave for up to twelve weeks for "a serious medical condition that makes the employee unable to perform the functions of the position of such employee …," or to care for a family member with a serious health condition. 29 U.S.C. § 2612(a)(1)(C), (D); *see Geromanos v. Columbia University*, 322 F. Supp. 2d 420, 426 (S.D.N.Y. 2004) (citing *Sarno v. Douglas–Elliman*, 183 F.3d 155, 160-61 (2d Cir.1999)). At the end of FMLA leave, the employee is entitled to reinstatement to her former position or an equivalent position. 29 U.S.C. § 2614(a). The statute further provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" any substantive FMLA right, 29 U.S.C. § 2615(a)(1), and that "[i]t shall be unlawful for any

---

[4]The FMLA does not require an exhaustion of administrative remedies prior to initiation of a lawsuit under its provisions. *See* 29 U.S.C. § 2617(a)(2); *see also Manos v. Geissler*, 377 F. Supp. 2d 422, 427 (S.D.N.Y. 2005).

employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the statute. 29 U.S.C. § 2615(a)(2).

In order to make out a *prima facie* case that ECC interfered with, restrained, or denied the exercise of her FMLA rights, plaintiff must establish that (1) she is an eligible employee under the FMLA, (2) ECC is an employer as defined in FMLA, (3) she was entitled to leave under FMLA, (4) she gave notice of her intention to take leave, and (5) she was denied benefits to which she was entitled under FMLA. *Geromanos*, 322 F. Supp. 2d at 427 (citing *Santos v. Knitgoods Workers' Union, Local 155*, 1999 WL 397500, at *3 (S.D.N.Y. June 15, 1999), *aff'd*, 252 F.3d 175 (2d Cir. 2001)). Plaintiff's FMLA claim fails at the fifth step of the *prima facie* inquiry because the record on summary judgment is clear that ECC approved plaintiff's singular request for FMLA leave, providing her with all of the benefits to which she was entitled under the Act.

As discussed above, plaintiff took an extended one-year leave of absence from work between July 2008 and July 2009. She gave ECC notice of her intent to take FMLA leave by submitting a Request for Leave of Absence form dated July 15, 2008. Item 151-2, p. 5. ECC's Director of Human Resources, Eileen Flaherty, then sent plaintiff a series of letters advising her that she was eligible for FMLA leave, but the form she submitted did not contain the correct dates and lacked the required signatures. *Id.* at 5-9. Plaintiff finally submitted the required paperwork, and ECC approved her request for 12 weeks of FMLA leave from July 15, 2008 through October 6, 2008. *Id.* at 11.[5] The remainder of her extended leave was charged as administrative leave without pay. She returned to her

---

[5]Plaintiff submitted the properly completed Request for Leave of Absence form on October 17, 2008, eleven days after her FMLA leave had expired.

previous position, and has made no other requests for FMLA leave during her employment at ECC.  Item 151-1, p. 19; Item 151-2, ¶ 7.

Based on these undisputed facts, it is clear that plaintiff received the full 12-week leave to which she was entitled under the FMLA, and she cannot establish a *prima facie* case that ECC violated 29 U.S.C. § 2615(a)(1) by interfering with, restraining, or denying the exercise of her FMLA rights, as a matter of law.  *See Geromanos*, 322 F. Supp. 2d at 427-28 (granting summary judgment dismissing interference claim where plaintiff received all 12 weeks of FMLA leave).

The FMLA also protects employees from being retaliated against for exercising their FMLA rights.  *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008), *cited in Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011).  To the extent plaintiff's pleadings in this case can be construed to allege a claim that ECC retaliated against her for exercising her FMLA rights, plaintiff must first establish a *prima facie* case by showing that (1) she exercised rights protected under the FMLA, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Geromanos*, 322 F. Supp. 2d at 433-34 (citing *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)).  If plaintiff establishes a *prima facie* case, the burden then shifts to ECC to articulate a legitimate, clear, specific and nondiscriminatory reason for its actions. *Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 317-18 (S.D.N.Y. 2012) ("Where, as here, a plaintiff alleges an FMLA retaliation claim without direct evidence of the employer's retaliatory intent, the claim is evaluated under the

burden-shifting framework set forth in *McDonnell Douglas* ….")).  "If the employer satisfies that burden, … the plaintiff has the burden to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for [retaliation]."  *Esser v. Rainbow Adver. Sales Corp.*, 448 F. Supp. 2d 574, 581 (S.D.N.Y. 2006).

ECC contends that plaintiff's FMLA retaliation claim must be dismissed at the *prima facie* stage because plaintiff has failed to come forward with evidence to support a finding that she suffered an adverse employment action under circumstances giving rise to a reasonable inference of retaliatory intent.  Although it is not crystal clear from the pleadings, plaintiff's deposition testimony can be understood to allege that she suffered an adverse action in retaliation for exercising her FMLA rights when, upon returning from her extended leave of absence in July 2008, her assigned work hours were changed from a schedule of 9:00 a.m – 5:00 p.m. to 8:00 a.m.– 4:00 p.m.  She testified that this has resulted in an increase in her day care costs, and that her medical condition makes it difficult for her to "get going"  so early in the morning.  *See* Item 151-1, pp. 23-24.

"For purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights."  *Millea*, 658 F.3d at 164 (joining sister circuits in applying Title VII anti-retaliation standard of *Burlington Northern & Santa Fe Railroad Co. v. White*, 548 U.S. 53 (2006), to the FMLA context).  While there is case law decided after *White* (and *Millea*) to support a finding that a reasonable employee would not consider a minor (one-hour) change in her schedule to be materially adverse, *see, e.g., Lushute v. Louisiana, Dept. of Social Services*, ___ F. App'x ___, 2012 WL 1889684, at *2 (5th Cir.

May 25, 2012) (change in work schedule from four-day/forty-hour week to five-day/forty-hour week, with no change in compensation, would not dissuade reasonable worker from making charge of discrimination); *Hamedl v. Weiland*, 2012 WL 3903499, at *8 (E.D.N.Y. Sept. 6, 2012) (reassignment from midnight shift to 6:00 a.m. shift following return from FMLA leave not materially adverse action); *Phillips v. United Parcel Service*, 2011 WL 2680725, at *8 (N.D.Tex.) (change in schedule or job duties implemented for sound reason and unaccompanied by any change in title, salary, benefits, or opportunities for promotion does not constitute materially adverse action), *report and recommendation adopted by* 2011 WL 2678949 (N.D.Tex. Jul. 8, 2011), *aff'd*, ___ F. App'x ___, 2012 WL 3264274 (5th Cir. Aug. 10, 2012), the Second Circuit has cautioned that the *White* standard requires the court to consider the context in which the employment action occurred:

> [B]y considering the perspective of a reasonable employee, *White* bespeaks an objective standard. The standard may be objective, but context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Therefore, an act that would be immaterial in some situations is material in others. For example, a schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. And of course context can diminish as well as enlarge material effect.

*Baines*, 593 F.3d at 165.

However, even if the one-hour schedule change could be found in context to constitute a materially adverse employment action, plaintiff has failed to show that the action occurred under circumstances giving rise to a reasonable inference of retaliatory intent. In this regard, ECC has submitted the declaration of Richard Schott, ECC's Associate Vice President for Finance, establishing that when plaintiff began her extended

one-year leave in July 2008, her supervisor was Karen Maloney, who was then ECC's Chief Accountant. Ms. Maloney's work hours were generally from 9:00 or 9:30 a.m. to 5:00 p.m., and plaintiff's work hours were determined so as to correspond with Ms. Maloney's schedule. Item 151-3 (Schott Decl.), ¶ 4. In July 2009, when plaintiff returned to her former position after her leave, Mr. Schott became her supervisor. This arrangement was requested by Ms. Maloney for operational efficiency, since plaintiff already received direction for the majority of her audit assignments through Mr. Schott. *Id.* at ¶ 5.

Mr. Schott set plaintiff's schedule from 8:00 a.m. to 4:00 p.m., the same schedule required of the other 20-25 full-time ECC employees under his supervision in the Finance Department, as well as the schedule worked by many employees in other departments located across ECC's three campuses. *Id.* at ¶ 6. This schedule is reasonably related to the performance of the duties associated with plaintiff's job, so as to facilitate her interaction with other employees within the Finance Department and her performance of auditing functions at other ECC departments that adhere to a similar schedule. *Id.* It also allows Mr. Schott to more effectively perform his supervisory functions, and to optimize operational efficiency by implementing and enforcing a uniform work schedule. *Id.* at ¶¶ 6-7.

Given these sound reasons for requiring plaintiff to report to work at the same time as the other full-time employees of the Finance Department, and in the absence of any showing to support the inference that, more likely than not, discrimination was the real reason for the action taken by ECC upon plaintiff's return from extended combined FMLA/administrative leave of absence, no rational jury could find that a reasonable employee in plaintiff's position would consider the reassignment of plaintiff from a 9:00 a.m.

to 5:00 p.m. schedule to a schedule of 8:00 a.m. to 4:00 p.m, unaccompanied by any change in work hours, job duties, title, salary, benefits, or opportunities for promotion, to constitute a materially adverse employment action. Accordingly, plaintiff cannot establish a *prima facie* case of retaliation for the exercise of FMLA rights, and defendants are entitled to summary judgment dismissing that claim as a matter of law.

### 3. *Plaintiff Cannot Maintain a Claim Against Mr. Reuter Individually Under Either the ADA or the FMLA*

It is well established that an individual defendant may not be held personally liable under the ADA. *Lundy v. Town of Brighton*, 521 F. Supp. 2d 259, 263 (W.D.N.Y. 2007) (citing *Cerrato v. Durham*, 941 F. Supp. 388, 395 (S.D.N.Y. 1996)).

With regard to plaintiff's FMLA claims against Mr. Reuter, an individual can face personal liability under the FMLA only if that person is an "employer" within the definition of the statute. *See Malena v. Victoria's Secret Direct, LLC*, ___ F. Supp. 2d ___, 2012 WL 3542192, at *12 (S.D.N.Y. Aug. 16, 2012); *Smith v. Westchester County*, 769 F. Supp. 2d 448, 475 (S.D.N.Y. 2011). The term "employer" in this context can include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of [the] employer." 29 U.S.C. § 2611(4)(A)(ii)(I); *see also* 29 C.F.R. § 825.104(d).

To determine whether an individual qualifies as an employer so as to justify imposing individual liability under the FMLA, district courts within the Second Circuit have adopted an "economic reality" test, which considers whether the individual "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment,

and (4) maintained employment records." *Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (internal quotation marks and citation omitted), *quoted in Malena*, 2012 WL 3542192, at *12. In short, "the Court must determine whether [the] named individual defendant controlled in whole or in part [p]laintiff's rights under the FMLA." *Smith*, 769 F. Supp. 2d at 475 (internal quotation marks, alterations, and citation omitted).

Applying these factors to the record on summary judgment in this case reveals that Mr. Reuter is not (and at the time of the events complained of, was not) involved in the day-to-day personnel decisions at ECC related to FMLA leave. Item 151-2 (Flaherty Decl.), ¶ 10. As indicated above, Mr. Reuter was the Interim President of ECC during plaintiff's FMLA leave, and became the Chief Administration and Financial Officer of ECC in April 2008. *Id.* at ¶ 9. He had no involvement with any personnel decisions relating to plaintiff's requests for time off, FMLA leave, or her return to work following her leave. *Id.* at ¶ 10. In the absence of any contrary showing by plaintiff, no rational juror could find "as a matter of economic reality" that Mr. Reuter controlled in whole or in part plaintiff's rights under the FMLA. *Smith*, 769 F. Supp. 2d at 475.

Accordingly, all claims brought against Mr. Reuter in his individual capacity must be dismissed.

**CONCLUSION**

Based on the foregoing, the motions for summary judgment filed by NYSDOTF (Item 150), the ECC Defendants (Item 151), and the County of Erie (Item 152) are granted, and the case is dismissed in its entirety.

The Clerk of the Court is directed to enter judgment in favor of defendants, and to close the case.

So ordered.

                                              _____
                                              \s\ John T. Curtin
                                              JOHN T. CURTIN
                                              United States District Judge

Dated:    11/29/2012
p:\pending\2006\06-299.nov7.2012